# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SANYO ELECTRIC CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0723-MTZ |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  November 18, 2020
Date Decided:  February 26, 2021

Todd C. Schiltz, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; David Ben-Meir, NORTON ROSE FULBRIGHT US LLP, Los Angeles, California; Mark Eberhard, Erik Janitens, and Jaime Stark, NORTON ROSE FULBRIGHT US LLP, Houston, Texas, *Attorneys for Plaintiff and Counterclaim Defendant Sanyo Electric Co., Ltd.*

Jack B. Blumenfeld and Jennifer Ying, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Tiffany P. Cunningham, PERKINS COIE LLP, Chicago, Illinois; Chad S. Campbell, Tyler R. Bowen, and Bryan Banks, PERKINS COIE LLP, Phoenix, Arizona, *Attorneys for Defendant and Counterclaim Plaintiff Intel Corporation.*

**ZURN, Vice Chancellor.**

Cross licensing is common in the computer and semiconductor industries, in which complex products are susceptible of being covered by hundreds of patents.[1] Generally, a cross license is "an agreement between two or more patentees to exchange licenses for their mutual benefit and use of the licensed products," allowing each contracting party to participate in what would otherwise amount to patent infringement.[2] Competitors in a common field of innovation come together and agree in advance that neither will be precluded by the other's patents from introducing new products or adopting new processes.[3] "As a result of the cross license, the industry leaders are effectively unable to use patents against one another."[4]

The parties here, market leaders in the computer and semiconductor industry, have been counterparties to a cross license since 1982. This action arises from a

---

[1] Cecil D. Quillen, Jr., Cornerstone Rsch., American Law Institute-American Bar Association Continuing Legal Education Advanced New ALI-ABA Course of Study, Intellectual Property Licensing in Today's "E-conomy", Licensing Strategies for Innovators 242 (May 29–30, 2003) (transcript available in West's ALI database at SH087 ALI-ABA 235); *see also* John H. Barton, *Patents and Antitrust: A Rethinking in Light of Patent Breadth and Sequential Innovation*, 65 Antitrust L.J. 449, 462 ("Normally, when confronted with a variety of patents having overlapping claims and owned by a number of different firms, cross-licenses are negotiated, if only to avoid conflict over mutually blocking patents. The arrangements may relate only to current technologies or may affect future technologies as well. . . . Among the most important examples of such cross-licenses is the semiconductor fabrication sector.").

[2] *License*, Black's Law Dictionary (11th ed. 2019) (defining "cross-license").

[3] *See* Quillen, *supra* note 1, at 243.

[4] Barton, *supra* note 1, at 463.

June 30, 2006 Patent Cross License Agreement (the "Cross License") between Plaintiff and Counterclaim Defendant Sanyo Electric Co., Ltd. ("Sanyo") and Defendant and Counterclaim Plaintiff Intel Corporation ("Intel"). Sanyo and Intel have cross-moved for summary judgment on a number of issues, centering on whether the Cross License permits Intel to make and sell Wi-Fi adapters under Sanyo's patents. This memorandum opinion resolves those cross motions with respect to the Cross License's scope and the parties' rights thereunder, as well as whether reformation is available as a remedy to Sanyo. For the reasons that follow, partial summary judgment is entered in Intel's favor regarding the scope of the Cross License as written, with the caveat that Sanyo may still be able to prevail on reformation of the Cross License.

## I.    BACKGROUND[5]

Intel is a Delaware corporation and a leading manufacturer, designer, and supplier of integrated circuit products, also called chips or semiconductor devices.[6] For fifty years, Intel has designed, manufactured, and supplied a variety of chips, including microprocessors, digital signal processors, network processors, application processors, memory chips, radio frequency chips, and many others.[7] Intel's contractual counterparty and competitor, Sanyo, is a Japanese corporation.[8] Historically, Sanyo has manufactured televisions and other consumer electronics, mobile phones, rechargeable batteries, solar cells, and a range of integrated circuit

---

[5] Citations in the form of "Am. Compl. ¶ —" refer to Sanyo's Amended Complaint, available at Docket Item ("D.I.") 28. Citations in the form of "Countercl. ¶ —" refer to Intel's Counterclaim, available at D.I. 32. Citations in the form of "Cross License § —" refer to the Cross License, available as Exhibit 1 to Sanyo's Amended Compliant and Exhibit A to Intel's Counterclaim. Citations in the form of "Kitchin Decl. —" refer to the Declaration of Duncan Kitchin in Support of Intel Corporation's Motion for Partial Summary Judgment, available at D.I. 109. Citations in the form of "Counsel Decl. —" refer to the Counsel Declaration (Nathan Kassebaum) in Support of Intel Corporation's Motion for Partial Summary Judgment, available at D.I. 109. Citations in the form of "Def.'s Ex. —" refer to exhibits to the Counsel Declaration, available at D.I. 109 and D.I. 110. Citations in the form of "Pl.'s Ex. —" refer to exhibits to the Transmittal Affidavit of Todd C. Schiltz in Support of Sanyo's Cross Motion for Partial Summary Judgment and in Opposition to Intel's Motion for Partial Summary Judgment, available at D.I. 123, D.I. 124, D.I. 125, and D.I. 126.

[6] *See* Def.'s Ex. 1 at 5; Def.'s Ex. 2 at 1.

[7] *See* Def.'s Ex. 1 at 5.

[8] Am. Compl. ¶ 23. Sanyo is now a wholly owned subsidiary of Panasonic Corporation. *Id.*

3

products, including microcontrollers and specialized chips for televisions and solar cells.[9]

Intel and Sanyo first entered a long-term, portfolio-wide patent cross license agreement in 1982.[10] More than two decades later, in 2005, they began negotiating a new agreement to capture additional patents that had issued in the interim.[11] The parties' negotiations lasted over a year, spanned several drafts, emails, and in-person meetings, and culminated in the final Cross License.[12] After extensive negotiations, including over whether chips mounted on cards—specifically Wi-Fi adapters referred to as Wireless Communication Modules ("WCMs")—were included in the Cross License,[13] the parties signed the final Cross License, which became effective on June 30, 2006.[14] The Cross License punctuated the parties' extensive negotiations with an integration clause.[15]

---

[9] *See* Def.'s Ex. 3.

[10] Def.'s Ex. 4.

[11] *See* Am. Compl. ¶ 25.

[12] *See, e.g., id.* ¶¶ 8, 30; Pl.'s Ex. 9; Pl.'s Ex. 22; Pl.'s Ex. 23; Pl.'s Ex. 24; Pl.'s Ex. 25; Pl.'s Ex. 26; Pl.'s Ex. 27; Pl.'s Ex. 29; Pl.'s Ex. 30.

[13] *See, e.g.,* Pl.'s Ex. 10; Pl.'s Ex. 11; Pl.'s Ex. 12; Pl.'s Ex. 13; Pl.'s Ex. 14; Pl.'s Ex. 15; Pl.'s Ex. 27; Pl.'s Ex. 29; Pl.'s Ex. 31; Pl.'s Ex. 32; Pl.'s Ex. 33; Pl.'s Ex. 34; Pl.'s Ex. 35; Pl.'s Ex. 36; Def.'s Ex. 11; Def.'s Ex. 14; Def.'s Ex. 15; Def.'s Ex. 16.

[14] *See generally* Cross License.

[15] *Id.* § 6.6.

The Cross License addresses the manufacture of, sale of, and materials and components used in computer chips, memory, processors, central processing units, solar cells, displays, and more.[16] The relevant provisions here grant Intel a nonexclusive license under Sanyo's patents to "make, use, sell (directly and/or indirectly), offer to sell, import and otherwise dispose of" Intel Licensed Products,[17] which include "any product that constitutes an Integrated Circuit."[18] The dispute in this case concerns the Cross License's definitions of "Intel Licensed Product" and "Integrated Circuit," and the actions the Cross License allows Intel to take with those items.

The parties agree that, at bottom, an Integrated Circuit is a computer chip.[19] Such chips are used to make up the processing and memory of modern computers.[20] A chip is "a device consisting of a number of connected circuit elements, such as transistors and resistors, fabricated on a single chip of silicon crystal or other

---

[16] *See, e.g.*, *id.* §§ 1, 3.

[17] *Id.* § 3.1(a).

[18] *Id.* § 1.13; *see also id.* § 1.6 (defining "Integrated Circuit").

[19] *See* Pl.'s Ex. 3 at 98 (defining "chip" by referring to "integrated circuit"); *id.* at 277 (defining "integrated circuit"); Pl.'s Ex. 1 ¶ 67 ("An integrated circuit is . . . [a]lso called: chip.'"); *id.* ¶ 240 ("Based on the foregoing, one in the industry would conclude that 1.6(a) is a definition of what is conventionally known as a chip, or integrated circuit—the term sought to be defined."). Both Sanyo and Intel have served expert reports that provide the parties' views on technical aspects of the Cross License. *See* Pl.'s Ex. 1; Pl.'s Ex. 2.

[20] *See, e.g.*, Pl.'s Ex. 1 ¶ 70.

semiconductor materials."[21]   The silicon portion of the chip is a semiconducting substrate.[22]   The silicon is typically hermetically sealed in packaging, with conductive leads protruding from it that enable portions of the chip to connect to other components.[23]   Chips are often mounted on printed circuit boards ("PCBs") to form what are known as cards or adapters that can be plugged into a computer to provide additional functionality.[24]   Such cards and adapters include, among other things, wireless adapters or cards that provide computers with wireless internet capabilities; such adapters are sometimes referred to as WCMs.[25]

---

[21] Pl.'s Ex. 3 at 277; *accord* Pl.'s Ex. 1 ¶ 67.

[22] *See* Pl.'s Ex. 3 at 472; Pl.'s Ex. 1 ¶¶ 66, 184.

[23] *See* Pl.'s Ex. 1 ¶¶ 102–15, 203, 205.

[24] *See* Pl.'s Ex. 3 at 84 (defining "card" as "[a] printed circuit board or adapter that can be plugged into a computer to provide added functionality or new capability," explaining that "[t]hese cards provide specialized services, such as mouse support and modem capabilities, that are not built into the computer," and cross-referencing "adapter, board, printed circuit board"); *id.* at 419 (defining a PCB as a "flat board made of nonconducting material, such as plastic of fiberglass on which chips and other electronic components are mounted"); Pl.'s Ex. 1 ¶ 39 (describing Wi-Fi adapters as "products generally consist[ing] of specialty baseband and MAC chips assembled on a printed circuit board with other components that are necessary to enable Wi-Fi communications"); *id.* ¶ 109 (describing how an integrated circuit is mounted on a PCB).

[25] *See* Kitchin Decl. ¶¶ 6–17; *see also* Pl.'s Ex. 1 ¶ 39 (describing various Intel Wi-Fi adapters or cards and referring to "these wireless cards as 'wireless communication modules' or 'WCM'").

After executing the Cross License, Intel began producing Intel-designed, single-chip MAC/baseband/radio processors for Wi-Fi (the "Wi-Fi Chips").[26] The parties agree that the Wi-Fi Chips are Integrated Circuits under the Cross License.[27] Each Wi-Fi Chip is mounted on a wireless adapter card that plugs into a computer's main system board.[28] When the Wi-Fi Chip is mounted on the adapter board, or PCB, it forms a WCM (the "Intel WCM").[29]

---

[26] *See* Kitchin Decl. ¶¶ 11–15. "MAC" stands for medium access control, one of three major tasks that the highly integrated processor provides. *Id.* ¶¶ 3, 12. The other two task categories are radio frequency processing and digital signal processing. *Id.*

[27] Intel concedes that the Wi-Fi card as a whole does not meet the definition of Integrated Circuit under the Cross License. *See* Pl.'s Ex. 40 at 30 (contending only that the Wi-Fi Chips "are Integrated Circuits," "regardless of whether the chips support wireless functions and regardless of the unit of sale that Intel makes to its customers"); D.I. 109 at 29 ("Whether the wireless adapter as a whole constitutes an Integrated Circuit is beside the point."); *id.* at 35 ("Intel does not contend that the license grant of Section 3.1 extends to 'Wireless Communication Modules.'").

[28] *See, e.g.*, Kitchin Decl. ¶¶ 11–16 (describing an Intel WCM as having a Wi-Fi Chip mounted on the adapter's PCB); Pl.'s Ex. 32 ¶ 41 (noting that "an Intel-WiFi chip is mounted onto a printed circuit board . . . on the Intel 7265 Wi-Fi adapter").

[29] *See* Kitchin Decl. ¶¶ 11–16; Pl.'s Ex. 32 ¶ 41.

Intel has produced multiple generations of Intel WCMs and sells them to Lenovo to provide Wi-Fi functionality in Lenovo computers.[30]  Below is an image of the inside of a 2017 Lenovo Thinkpad T470 laptop computer.[31]  The red circle highlights the Intel WCM, specifically an Intel Dual Band Wireless-AC 8265 wireless adapter.[32]



---

[30] *See, e.g.*, Pl.'s Ex. 1 ¶¶ 38–39; Def.'s Ex. 10.

[31] Kitchin Decl. ¶ 16.

[32] *Id.*  The Intel Dual Band Wireless-AC 8265 wireless adapter is one generation of an Intel WCM, but is generally representative of all Intel WCMs.

The next images zero in on that Intel WCM: the picture on the left shows the Intel WCM with the adapter's cover intact, and the picture on the right shows the Intel WCM with the cover removed.[33] As highlighted in red, a single large Integrated Circuit—a Wi-Fi Chip—is mounted on the Intel WCM's adapter board.[34]

 

In 2011, five years after executing the Cross License, Sanyo sold a large portfolio of "Wi-Fi Patents" related to wireless communication to nonparty Hera Wireless S.A., a patent enforcement entity ("Hera").[35] In the sale, Sanyo assigned only those rights "as would have been held and enjoyed by [Sanyo] had th[e] Assignment not been made."[36] Sanyo did not specifically identify the Cross License

---

[33] *Id.* ¶ 14.

[34] *Id.*

[35] *See* Am. Compl. ¶¶ 9, 97; Def.'s Ex. 8; D.I. 108, Ex. 2; D.I. 108, Ex. 4.

[36] D.I. 108, Ex. 4 at SANYO0006164; D.I. 108, Ex. 3 at SANYO0006161.

to Hera as an encumbrance on Sanyo's rights.[37]  In exchange for the Wi-Fi Patents,

Hera agreed to give Sanyo, *inter alia*, a percentage of the revenues that Hera collects

in the future through its efforts to license and enforce the Wi-Fi Patents.[38]

In August 2017, Hera and its authorized licensing company, Sisvel UK

Limited ("Sisvel") sued Lenovo and other companies for patent infringement in the

United States District Court for the District of Delaware.[39]  Hera and Sisvel alleged

that Lenovo products that use Wi-Fi Chips in Intel WCMs infringe nine of the Wi-

Fi Patents that Hera acquired from Sanyo.[40]  The suit specifically identifies and

---

[37] *See* Def.'s Ex. 17 at 3 (stating that "Sanyo admits only that it did not inform Hera of the Cross License," and that "Sanyo admits that Sanyo identified to Hera licensees to the Assigned Patents, and that Intel was not identified to Hera as a licensee"); *see also* D.I. 108, Ex. 2; D.I. 108, Ex. 4.

[38] *See, e.g.*, Def.'s Ex. 8 § 3.1.

[39] *See, e.g.*, Am. Compl. ¶¶ 11–12; Countercl. ¶¶ 16–18.  The Hera suits include the following:  *Hera Wireless SA v. Lenovo Holding Company, Inc.*, Civ. No. 1-17-cv01088-RGA (D. Del.); *Hera Wireless SA v. LG Electronics, Inc.*, Civ. No. 1-17-cv01089-RGA (D. Del.); *Hera Wireless SA v. Amazon.com, Inc.*, Civ. No. 1-17-cv-00947-RGA (D. Del.); *Hera Wireless SA v. ARRIS Group, Inc.*, Civ. No. 1-17-cv-00948-RGA (D. Del.); *Hera Wireless SA v. Belkin International, Inc.*, Civ. No. 1-17-cv-00949-RGA (D. Del.); *Hera Wireless SA v. Buffalo Americas, Inc.*, Civ. No. 1-17-cv-00950- RGA (D. Del.); *Hera Wireless SA v. Netgear, Inc.*, Civ. No. 1-17-cv-00951-RGA (D. Del.); *Hera Wireless SA v. Roku, Inc.*, Civ. No. 1-17- cv-00952-RGA (D. Del.).

[40] *See, e.g.*, Am. Compl. ¶¶ 11–12; Countercl. ¶¶ 16–18.  The Wi-Fi Patents are U.S. Patent Nos. 7,369,878; 7,454,234; 7,873,389; 7,962,103; 8,295,400; 8,412,115; 8,737,377; 8,934,851; and 9,270,024.  *E.g.*, Countercl. ¶ 16.  The lawsuit against Lenovo has been stayed pending completion of *inter partes* review proceedings at the Patent Trial and Appeal Board of the United States Patent and Trademark Office regarding eight of the nine asserted patents.  To date, all challenged claims have been found unpatentable, and Hera has appealed to the United States Court of Appeals for the Federal Circuit.  Counsel Decl. ¶¶ 19–20; Def.'s Ex. 18.

accuses nine generations of Intel WCMs that use Wi-Fi Chips as the source of infringement.[41]

Intel later learned that Sanyo had never informed Hera about the existence or terms of the Cross License.[42] Intel brought the Cross License to Hera's attention and asked Hera to dismiss the claims targeting any Lenovo computer that is equipped with an Intel WCM that includes a Wi-Fi Chip. Intel reasoned that the Cross License authorized Intel to sell to Lenovo Intel WCMs that include Wi-Fi Chips and that, because the Wi-Fi Chips substantially embody the claims under Hera's infringement theory, the patents were exhausted as to Lenovo computers using the Wi-Fi Chips.[43] Hera refused to dismiss the claims.[44]

---

[41] *See, e.g.*, Def.'s Ex. 10.

[42] *See* Def.'s Ex. 17 at 3.

[43] *See* Def.'s Ex. 19. The doctrine of patent exhaustion limits the patent rights that survive the initial authorized sale of a patented item and the patentee's right to control what others can do with an article embodying or containing an invention. Under the doctrine, "the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Comput. Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). However, "[e]xhaustion is triggered only by a sale authorized by the patent holder." *Id.* at 636. Thus, "if a patentee has not given authority for a licensee to make a sale, that sale cannot exhaust the patentee's rights." *Purdue Pharma L.P. v. Collegium NF, LLC*, 2019 WL 2525399, at *4 (D. Del. June 19, 2019) (quoting *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1535 (2017)). But if authorized, the sale exhausts the patentee's monopoly over the item and gives the purchaser, or any subsequent owner, a right to use or resell that article. *See Bowman v. Monsanto Co.*, 569 U.S. 278, 283 (2013).

[44] *See* Def.'s Ex. 20.

In February 2018, Intel raised the issue with Sanyo and invoked the Cross License's dispute resolution procedures.[45] Intel and Sanyo met three times, including once with a mediator.[46] The parties' efforts were unsuccessful.

Sanyo filed this action in October 2018.[47] In September 2019, Sanyo filed the operative amended complaint (the "Amended Complaint").[48] Count I seeks a declaratory judgment of the parties' rights under the Cross License, specifically requesting an order that the Cross License does not authorize Intel to make or sell WCMs and that any of Intel's customers' products incorporating Intel's WCMs are not licensed or authorized under the Cross License.[49] Count II asserts a claim for intentional interference with performance of contract by a third party, specifically Hera.[50] Count III asserts a claim for intentional interference with another's performance of his own contract.[51] Count IV asserts a claim for trespass to chattels.[52] And Count V seeks reformation of the Cross License "[i]n the event that it is

---

[45] *See* Def.'s Ex. 21.

[46] *See id.*; D.I. 109 at 16.

[47] D.I. 1.

[48] *See generally* Am. Compl.

[49] *Id.* ¶¶ 120–48.

[50] *Id.* ¶¶ 149–56.

[51] *Id.* ¶¶ 157–67.

[52] *Id.* ¶¶ 168–79.

determined that the Cross License [], as written, licenses Intel to make and sell WCM."[53]

Intel filed its Answer and Counterclaim in October 2019.[54] Count I alleges that Sanyo breached the Cross License by assigning the Wi-Fi Patents to Hera.[55] Count II seeks a declaratory judgment that the Wi-Fi Patents are subject to the Cross License; that Intel's Integrated Circuits, specifically the Wi-Fi Chips that perform wireless communication functionality, are licensed under the Cross License; and that, therefore, the Cross License does not foreclose the production and sale of Intel WCMs.[56]

After substantial discovery, the parties turned to summary judgment to resolve the pending claims. The parties filed and briefed cross motions on Count I of the Counterclaim, concerning whether Sanyo's Hera assignment breached the Cross License.[57] The parties also filed and briefed cross motions on Count I of the Amended Complaint and Count II of the Counterclaim, concerning whether Intel's Wi-Fi Chips are licensed under the Cross License when used in Intel WCMs.[58] In

---

[53] *Id.* ¶ 186; *see also id.* ¶¶ 180–85, 187.

[54] *See generally* Countercl.

[55] *Id.* ¶¶ 60–77.

[56] *Id.* ¶¶ 78–87.

[57] *See* D.I. 108; D.I. 128; D.I. 133; D.I. 139.

[58] *See* D.I. 109; D.I. 122; D.I. 134; D.I. 143.

particular, Intel moved on the grounds that the Wi-Fi Chips that are sold to Lenovo as a component of Intel WCMs are licensed;[59] Sanyo cross-moved on the grounds that "Intel does not have a license [to] sell Wi-Fi adapters or Wi-Fi chips as components of Wi-Fi adapters under Section 3.1 of the Cross License."[60] Finally, Intel sought summary judgment on Count V of the Amended Complaint, contending that Sanyo's reformation claim is barred by the Cross License's integration clause.[61] The parties briefed these motions (the "Motions") as of November 3.[62]

I heard argument on the Motions on November 18.[63] I took the Motions under advisement only with respect to the Cross License's scope and the availability of reformation.[64] The remaining issues depend at least in part on the outcome of this decision and therefore remain pending.[65]

---

[59] D.I. 109, Mot.

[60] D.I. 122, Mot.

[61] *See* D.I. 109.

[62] *See* D.I. 109; D.I. 122; D.I. 134; D.I. 143.

[63] *See* D.I. 155 [hereinafter "Hr'g Tr."].

[64] *Id.* 69–70.

[65] After argument, I concluded that judicial economy would be best served by handling the remaining issues in phases. Today, I adopt Intel's reading of the Cross License and conclude its integration clause does not bar reformation. The next phase of litigation will focus on the parties' negotiation history and whether there are genuine issues of material fact that preclude summary judgment on reformation, as well as whether Sanyo breached the Cross License via the Hera assignment and its involvement or lack of involvement in the underlying infringement litigation. *See* Hr'g Tr. 69–71. A scheduling conference is set in the coming weeks.

## II.    ANALYSIS

Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.[66]

> Where the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.[67]

In cases involving questions of contract interpretation, like this one, the Court will grant summary judgment in two scenarios:  (1) when the contract is unambiguous, or (2) when the extrinsic evidence fails to create a triable issue of material fact.[68] Accordingly, "[s]ummary judgment is the proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[69]

The parties dispute whether the Cross License, as written, licenses Wi-Fi Chips when mounted on cards or adapters, as in an Intel WCM.  The parties agree that the Cross License's language is clear and unambiguous and that there are no

---

[66] Ct. Ch. R 56(c).

[67] *Id.* 56(h).

[68] *E.g.*, *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012).

[69] *HIFN v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007).

15

genuine disputes of material fact.[70]   Thus, the Cross License's scope, the parties' rights thereunder, and reformation's availability as a remedy based on the Cross License's plain language are suited for resolution on the Motions.

### A.    Section 3.1 Of The Cross License Permits Intel To Use Wi-Fi Chips In Intel WCMs.

The parties' cross motions pose the question of whether Intel has engaged in a licensed activity by placing the Wi-Fi Chips on adapter boards to form Intel WCMs.[71]   Section 3.1(a) permits Intel to "make, use, sell (directly and/or indirectly), offer to sell, import and otherwise dispose of all Intel Licensed Products."[72]   Section 1.13 defines "Intel Licensed Product" as "any product that constitutes an Integrated Circuit, and that if sold, is sold by Intel or an Intel Licensed Subsidiary as its own product . . . and not on behalf of another, provided that Intel Licensed Product shall not include any Sanyo Proprietary Product."[73]

I conclude that the Wi-Fi Chips are and remain Intel Licensed Products when used or disposed of on an adapter board to form Intel WCMs.  I also conclude that the Cross License broadly permits Intel to use or dispose of the Wi-Fi Chips, and

---

[70] *See* Hr'g Tr. 68–69.

[71] *See, e.g.*, *id.* 45–46.

[72] Cross License § 3.1(a).

[73] *Id.* § 1.13.

16

that mounting them on adapter cards, even for eventual sale, is such a permitted use or disposal.

### 1. The Wi-Fi Chips Are Intel Licensed Products Under Section 1.13.

The parties' dispute centers on the proper reading of Section 1.13's phrase "any product that constitutes an Integrated Circuit," and the object or "product" it encompasses. The primary issue is whether the "product that constitutes an Integrated Circuit" is the Wi-Fi Chip regardless of its installation in an Intel WCM, or the Intel WCM as a unit.[74] I conclude that the "product" is the Wi-Fi Chip, not the Intel WCM. The rest of Section 1.13's requirements readily apply to the Wi-Fi Chip.

### a. Under Section 1.13, The Wi-Fi Chip Is A "Product."

Hera's infringement allegations against Intel focus on the alleged misuse of the Wi-Fi Chips contained in Intel WCMs, not the Intel WCMs as a whole. Intel therefore seeks summary judgment on the grounds that the Wi-Fi Chips are licensed, asserting that a Wi-Fi Chip is a "product that constitutes an Integrated Circuit" even when a part of an Intel WCM, such that Section 3.1's license encompasses the Wi-Fi Chips that are sold as components of Intel WCMs. Intel does not assert that Intel

---

[74] *Id.*

WCMs themselves qualify as an Integrated Circuit or Intel Licensed Product, nor that Intel WCMs are licensed under the agreement.[75]

Sanyo presses that the "product" under Section 1.13 is the Intel WCM as a whole, not the Wi-Fi Chip as a component. Under that theory, Sanyo concludes that the license does not encompass Intel WCMs. Sanyo's argument is incongruent with the underlying infringement dispute, and, more importantly, is unsupported by the plain language of the Cross License.

The plain meaning of Section 1.13 indicates that the "product" in question is the Wi-Fi Chip, in isolation or as a component of an Intel WCM. Section 1.13 broadly includes "*any* product" in the definition of Intel Licensed Product, so long as it "constitutes an Integrated Circuit."[76] Merriam-Webster defines "product" as "something produced."[77] Intel produces Wi-Fi Chips.[78] Therefore, the Wi-Fi Chip is a "product" under the Cross License's plain terms, even as a component of an Intel WCM. Other sections of the Cross License use the term "product" according to its

---

[75] *See* D.I. 109 at 27; D.I. 134 at 8–9.

[76] Cross License § 1.13 (emphasis added).

[77] *Product*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/product (last visited February 25, 2021).

[78] *See also Produce*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/produce (last visited February 25, 2021) (defining "produce" as "to compose, create, or bring out by intellectual or physical effort" or "to make available for public exhibition or dissemination").

common and ordinary meaning of "something produced," and use it to refer to components of a larger product.[79]

Sanyo tries to muddy this straightforward conclusion with three unsuccessful arguments. First, Sanyo argues that this plain definition of "product" would render Section 3.6 of the Cross License ambiguous. Section 3.6(h) provides in part that

---

[79] Section 1.33 defines "Sanyo Proprietary Product." Cross License § 1.33. The definition includes "CCB Circuitry" and further defines that term to mean certain "circuit blocks" and "circuitry." *Id.* Circuitry is a component integrated into a larger product (*e.g.*, a semiconductor chip), yet it qualifies as a "Sanyo Proprietary Product." Section 1.33 also notes that "CCB Circuitry" "shall not include any other product or circuitry." *Id.* The language "other product" in the definition of "CCB Circuitry" makes clear that CCB Circuitry is itself a product.

Section 1.13 provides, "Intel Licensed Product shall not include any Sanyo Proprietary Product." *Id.* § 1.13. This language contemplates that one product could include another absent such a prohibition.

And Section 3.3(b) provides that "[t]he Parties understand and acknowledge that a Party's Licensed Products may consist of firmware and drivers." *Id.* § 3.3(b). Thus, the term "product" refers to "firmware" and "drivers," which are components of an Integrated Circuit. And while Sanyo attempts to circumvent Section 3.3's illustration by arguing that firmware and drivers are supplied separately from an Integrated Circuit, Section 3.3(b) says no such thing. Instead, the provision describes distributing firmware and drivers using a "single master copy" without requiring separate shipments. Section 1.6 makes clear that such firmware and drivers can be "shipped with such integrated unit(s) and/or circuit(s)." *Id.* § 1.6. Contrary to Sanyo's reading, Section 3.3(b) shows the term "product" may extend to components of a larger object.

Finally, the Cross License contains another example of licensing a part of a whole where other parts of that whole may not be licensed. The last sentence of Section 1.6 explains that "if an integrated unit contains circuitry that satisfies the above definition but also contains circuitry that would satisfy the definition of Solar Cell, Liquid Crystal Display or Electroluminescence Display, only that circuitry within the integrated unit that satisfies the above definition shall be deemed an Integrated Circuit." *Id.* Accordingly, that circuitry does not lose its status as an Integrated Circuit and its associated rights simply because it is one component in a larger scheme.

19

Intel will grant a license to any entity that Sanyo divests so long as the divested entity's "cumulative net sales of products that constitute Sanyo Licensed Products" in the previous year does not exceed three billion dollars.[80] As with Intel Licensed Product, the Cross License defines Sanyo Licensed Product as "any product that constitutes an Integrated Circuit."[81] Sanyo argues that using the common and ordinary meaning of "product" in applying Section 3.6(h) would make it "impossible" to determine net sales of Sanyo Licensed Products under that section because a component part, like a Wi-Fi Chip sold as part of an adapter—does not "have a price per unit."[82]

Sanyo's argument is flawed in two respects. First, it presupposes that a Licensed Product under the Cross License must, or certainly will, be sold. As explained in more detail *infra*, the Cross License licenses actions in addition to sales. Sections 1.13 and 3.1 contemplate a sale as a possibility, but do not require it. Second, Sanyo's argument ignores the fact that a product within a component can have independent value, and that the value of the larger object in which it is incorporated can be apportioned to each of its components. As Sanyo's corporate representative acknowledged, "Integrated Circuits" sold in retail packages,

---

[80] Cross License § 3.6(h)(1)(i).

[81] *Id.* § 1.30.

[82] D.I. 122 at 4, 42–43.

including other items such as fans and heat sinks, would nevertheless be licensed,[83] even though such sales would require the very apportionment exercise that Sanyo deems impossible.

Sanyo's second argument against the common and ordinary meaning of the term "product" is that it renders part of the definition of "Integrated Circuit" in Section 1.6 meaningless. Section 1.6 offers two definitions of an Integrated Circuit. The first, Section 1.6(a), undisputedly encompasses a standalone Wi-Fi Chip.[84] Section 1.6(b) provides an additional definition of "an integrated unit" that (1) "consist[s] of one or more units falling within the terms of Section 1.6(a), on one or more substrates"; (2) "has associated with such integrated unit conductive leads, and/or conductive pads, and/or conductive traces and/or wire bonds and/or conductive bumps and/or solder balls"; and (3) is "sealed in one package; or physically integrated and sold as a unit primarily comprising a circuit assembly, the material function of which is to perform general computing tasks . . . and/or to store data . . . ."[85] Sanyo contends equating a Wi-Fi Chip with a "product," rather than

---

[83] *See* Pl.'s Ex.16 at 162–163.

[84] Cross License § 1.6(a) (defining "Integrated Circuit" as "an integrated unit comprising one or more active and/or passive circuit elements associated on one or more semiconductor substrates, such unit forming, or contributing to the formation of, a circuit for performing electrical functions (including, if provided therewith, housing and/or supporting means)").

[85] *Id.* § 1.6(b)(1)–(3); *see also id.* § 1.6 ("The definition of 'Integrated Circuit' shall also include, without limitation, any and all firmware, microcode and drivers, if needed to cause such integrated unit(s) and/or circuit(s) to perform substantially all of its (their) intended

limiting "product" to the larger assembly containing the Wi-Fi Chip, would render Section 1.6(b) meaningless as "an inconsequential expansion of the license right to merely cover additional conventional electrical components" like the PCB.[86]

But Section 1.6(b) covers assemblies of multiple chips and other technology that allows them to connect and cooperate, above and beyond inventions embodied by the single semiconductor chip defined in Section 1.6(a). Calling that singular chip a "product" under Section 1.13 licenses that chip as an Intel Licensed Product (assuming the other requirements of Section 1.13 are met). Licensing the chip does not transform any broader assembly of which it is a component into an Integrated Circuit or Intel Licensed Product. Such a broader assembly is licensed only if it meets other licensing requirements, like those in Section 1.6(b). Invoking the plain and ordinary meaning of "product" in Section 1.13 does not render Section 1.6(b)'s definition of Integrated Circuit meaningless.

Finally, Sanyo is correct that an Intel WCM is a "product" in that it is something Intel produces. But Intel WCMs can be products, and their component Wi-Fi Chips can also be products; either can only be an Intel Licensed Product by "constitut[ing] an Integrated Circuit" and meeting the other requirements of Section

---

hardware functionality, whether or not such firmware, microcode or drivers are shipped with such integrated unit(s) and/or circuit(s) or are installed at a later time.").

[86] D.I. 122 at 41.

1.13.[87]  Nothing in the plain language mandates limiting "product" to the Intel WCM, to the exclusion of its component Wi-Fi Chip.

### b. The Wi-Fi Chips Satisfy Section 1.13's Other Requirements.

Having determined that a Wi-Fi Chip is a "product" under Section 1.13, the other provisions of that Section readily apply.  First, Wi-Fi Chips "constitute[] an Integrated Circuit."[88]  In Sanyo's words, the parties agree that this language means that "the product must be or is an Integrated Circuit."[89]  They also agree Wi-Fi Chips are Integrated Circuits.[90]  The plain meaning of "constitutes" supports this equivalency.  Merriam-Webster defines "constitute" as "make up, form, compose."[91]  "Constitute," "compose," and "comprise" are interchangeable;[92] other synonyms for "constitute" include "form, make up."[93]  "Compose" means "to form by putting

---

[87] *See* Cross License § 1.13; *see also* Hr'g Tr. 17 ("The wireless adapter can be a product and also the chip itself is a product.  And what we know is that Intel's chips constitute an Integrated Circuit and would be licensed under the plain language of the cross license.").

[88] Cross License § 1.13.

[89] Hr'g Tr. 38; *see also id.* 21–22, 39.

[90] *See id.* 32; *see also id.* 18, 20, 29.

[91] *Constitute*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/constitute (last visited February 25, 2021) (offering as examples that "12 months constitute a year," that "high school dropouts . . . constitute a major problem in large city slums," that "[w]omen constitute 70 percent of the student population at the college," and that "nine players constitute a baseball team").

[92] *See Comprise*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/comprise (last visited February 25, 2021).

[93] *Constitute*, Merriam-Webster Online Dictionary, *supra* note 91 (listing synonyms).

together" or "to form by the substance of."[94]  "Make up" means "to form by fitting together or assembling" or "to combine to produce (a sum or whole)."[95]  And "form" means "to serve to make up or constitute : be an essential or basic element of."[96]  Therefore, a Wi-Fi Chip "constitutes an Integrated Circuit" and is a "product that constitutes an Integrated Circuit" under Section 1.13.[97]

---

[94]  *Compose*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/compose (last visited February 25, 2021).

[95]  *Make Up*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/make%20up (last visited February 25, 2021).

[96]  *Form*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/form (last visited February 25, 2021).

[97] Sanyo contends that by adopting the plain meaning of the term "constitutes," Intel reads the word "product" out of the definition of Intel Licensed Product.  D.I. 122 at 4.  Sanyo contends that "Intel is effectively rewriting the definition of Intel Licensed Product to read, in part, 'any ~~product that constitutes an~~ Integrated Circuit.'"  D.I. 143 at 3.  Sanyo's position fails for two reasons.

First, the Court's analysis gives meaning to each word of Section 1.13, including "product" and "constitutes."  The Wi-Fi Chip is a product, and it constitutes an Integrated Circuit in that the sum of its parts makes up an Integrated Circuit.  *See Constitute*, Merriam-Webster Online Dictionary, *supra* note 91 (offering as an example that "12 months constitute a year," indicating that a whole is constituted by the sum of its parts).  The plain meaning of the term supports this equivalency.

Second, Section 1.6 undermines Sanyo's position that the language of Section 1.13 "forecloses sale of Integrated Circuits as a component of a product."  D.I. 122 at 47.  Reading the Cross License as a whole indicates that the parties drafted Section 1.13 to read "any product that constitutes an Integrated Circuit" to account for Section 1.6(b), which allows a "product" with multiple parts to "constitute an Integrated Circuit.  *See* Cross License § 1.6(b).  By drafting Section 1.13 to read "any product that constitutes an Integrated Circuit," rather than "any Integrated Circuit," the parties built in necessary leeway to address inventions, present and future, that may satisfy the pluralities of Section 1.6(b).

Next, Section 1.13 mandates "that *if sold*," the product constituting the Integrated Circuit must be "sold by Intel or an Intel Licensed Subsidiary as its own product . . . and not on behalf of another."[98]  Sanyo contends that Intel cannot reconcile its interpretation of "product" with this language in Section 1.13 because Intel sells Intel WCMs, not Wi-Fi Chips as standalone products.  But the plain language of Section 1.13 does not require that any product thereunder be sold, and is not confined to products that are in fact sold by Intel.  Instead, Section 1.13 requires that Intel sell any product "as its own" only "*if sold*" at all.[99]  Broadly drafted, Section 1.13 accounts for the reality that Intel may or may not sell "any product that constitutes an Integrated Circuit."  As discussed below, this reading is consistent with Section 3.1(a).[100]

Finally, Section 1.13 requires that the "Intel Licensed Product shall not include any Sanyo Proprietary Product."[101]  There is no dispute that each of Intel's Wi-Fi Chips has no circuitry or other technology related to any "Sanyo Proprietary Product" as identified and defined in Section 1.33 of the Cross License.  Each Wi-

---

[98] Cross License § 1.13 (emphasis added).

[99] *Id.*

[100] Even if I were to conclude that the Wi-Fi Chips are technically "sold" when sold as a component of Intel WCMs, the chips would satisfy this requirement of Section 1.13:  the Wi-Fi Chips are proprietary to Intel and are sold with Intel's logo, as components of larger adapters which are also proprietary to Intel and sold with Intel's logo.

[101] Cross License § 1.13.

25

Fi Chip uses a proprietary Intel design.[102]  Because the Wi-Fi Chips do not include any Sanyo Proprietary Product, they satisfy that requirement of Section 1.13.

The Wi-Fi Chips are products that constitute Integrated Circuits and do not include any Sanyo Proprietary Product.  Hence, the Wi-Fi Chips are Intel Licensed Products under Section 1.13 and are licensed under Section 3.1.

> **2.  Under Section 3.1, Intel May "Use" Or "Otherwise Dispose Of" The Wi-Fi Chips As Components Of Intel WCMs.**

The next issue is whether using the Wi-Fi Chips in Intel WCMs fits into one of the permissible actions under Section 3.1.  Intel does not sell Wi-Fi Chips individually; it sells them as components of Intel WCMs.  Section 3.1(a) permits Intel to "make, use, sell (directly and/or indirectly), offer to sell, import and otherwise dispose of all Intel Licensed Products."[103]  I conclude that placing Wi-Fi Chips on adapter boards to form Intel WCMs is licensed as "us[ing]" or "otherwise dispos[ing] of" the Wi-Fi Chips.[104]

Section 3.1 grants Intel broad authority to act with respect to the Wi-Fi Chips.  Selling the Wi-Fi chips is only one of at least six actions Intel can take.  While "sale" may be a narrow term, the other actions are more expansive.  For example, "use"

---

[102] Kitchin Decl. ¶ 12.

[103] Cross License § 3.1(a).

[104] *Id.*

26

means "to carry out a purpose or action by means of."[105] "Use" of an Intel Licensed Product, such as a Wi-Fi Chip, can encompass a number of actions, including incorporating it into or onto an adapter card to enable the card "to carry out" a wireless communication purpose or function.

The broadest action is Section 3.1's catchall: "or otherwise dispose of."[106] "Dispose of" means "to get rid of," "to deal with conclusively," "to transfer to the control of another," or "to place, distribute, or arrange, especially in an orderly way."[107] Synonyms include "deposit, emplace, fix, lay, place, position, put, set, set up, situate, stick."[108] Accordingly, by "placing" or "putting" Wi-Fi Chips on adapter boards to form Intel WCMs, Intel "otherwise dispose[d] of" the Wi-Fi Chips.

Sanyo contends that "'otherwise dispose of' may mean a lot of different things . . . but it doesn't mean 'sell'" and that "the word that's relevant here is 'sell' because that's the activity that's at issue."[109] Sanyo's argument that the Cross License forecloses the use or of disposition of Wi-Fi Chips in Intel WCMs because

---

[105]  *Use*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/use (last visited February 25, 2021).

[106] Cross License § 3.1(a).

[107]  *See Dispose*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/dispose (last visited February 25, 2021).

[108] *See id.* (listing synonyms).

[109] Hr'g Tr. 45.

those WCMs are then sold is unsupported by its plain terms. This argument is a symptom of Sanyo's misplaced focus on Intel WCMs, rather than the Intel Licensed Products at issue: the Wi-Fi Chips.

Sanyo is correct that "otherwise dispose of" does not mean sell and requires some distinct action under Section 3.1. The product Intel "sells" is the Intel WCMs.[110] Sanyo skips the intermediate, yet critical, step before the sale of Intel WCMs: placing the Wi-Fi Chip on the adapter board for the purpose of enabling the adapter to carry out a wireless communication function. Other verbs govern what Intel does with the licensed Wi-Fi Chips it puts on adapter boards to form Intel WCMs. The fact that "sale" is a possible and express activity under Section 3.1 does not preclude licensing the potential intermediate steps of using or otherwise disposing of the Wi-Fi Chips. Sanyo conceded as much at argument, stating that Sanyo "wouldn't necessarily take issue with the idea that [Intel] can put [a Wi-Fi Chip] on a card, because that might be a use, too."[111]

Sanyo also argues that the Cross License permits Intel to sell the Wi-Fi Chips only with certain enumerated parts, such as those enumerated in Section 1.6(b), but

---

[110] *See id.* 37 ("Intel is not selling Integrated Circuits alone. . . . [I]f we were talking about selling Integrated Circuits alone, we wouldn't be having an argument about this. What they're doing is selling -- the thing that they're doing, the thing that they're selling, are these [WCMs].").

[111] *Id.* 47.

28

not with any type of Wi-Fi adapter card or in any WCM that is not specifically permitted or enumerated in the agreement.[112] But the Cross License is broadly permissive once the Wi-Fi Chips are "used" or "disposed of." Nothing in the Cross License mentions, let alone forbids, the use or disposition of Intel Licensed Products, such as the Wi-Fi Chips, in WCMs.[113] Nothing in the Cross License strips the Wi-Fi Chip of its license when it is used in an Intel WCM that is eventually sold. The Cross License prohibited certain combinations; the final sentence of Section 1.6 explicitly excludes Solar Cells, Liquid Crystal Displays, and Electroluminescence Displays from Integrated Circuits.[114] The plain text of the Cross License includes no such carveout for WCMs.

The Cross License's plain terms allow Intel to use or dispose of the Wi-Fi Chips by placing them on an adapter board to form an Intel WCM. Intel is therefore entitled to summary judgment on Count I of the Amended Complaint and Count II of the Counterclaim.

> **B.** **Reformation Is Not Foreclosed By Section 6.6 Of The Cross License.**

Having determined that Intel's actions are permitted under the plain text of the Cross License, I turn to Sanyo's contention that reformation is appropriate here.

---

[112] *See id.* 37–38.

[113] *See generally* Cross License.

[114] *See id.* § 1.6.

According to Sanyo, interpreting the Cross License to allow Intel to use Wi-Fi Chips in Intel WCMs that are sold is inconsistent with what the parties agreed upon in negotiations.[115] In response, Intel contends that any claim for reformation is foreclosed by the integration clause in Section 6.6 of the Cross License.[116] I conclude that Section 6.6 does not foreclose reformation.

The Court may reform a contract "only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence."[117] "It is true that evidence of agreements and negotiations prior to the adoption of a fully integrated contract are admissible to establish grounds for granting or denying the remedy of reformation."[118] But failure of justifiable reliance is fatal to a claim for mutual mistake that supports reformation.[119] This Court has determined that a

---

[115] As explained in note 65, *supra*, Sanyo's reformation argument will be addressed and resolved in a future opinion.

[116] *See* Cross License § 6.6.

[117] *Great-W. Invs. LP v. Thomas H. Lee P'rs, L.P.*, 2011 WL 284992, at *11 (Del. Ch. Jan. 14, 2011) (quoting *James River-Pennington Inc. v. CRSS Cap., Inc.*, 1995 WL 106554, at *7 (Del. Ch. Mar. 6, 1995)).

[118] *T.P. Inc. v. J&D's Pets, Inc.*, 1999 WL 135243, at *5 (Del. Ch. Feb. 26, 1999).

[119] *See Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002) (stating that "sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations" and dismissing mistake and fraud claims given anti-reliance integration clause in the written contract); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555–56 (Del. Ch. 2001) ("[W]ere we to permit plaintiffs' use of the defendants' prior representations . . . to

plaintiff's reliance is unreasonable where the parties have agreed to explicit anti-reliance language in the terms of the governing agreement.[120]   In *Progressive International Corp. v. E.I. Du Pont de Nemours & Co.*, then-Vice Chancellor Strine stated,

> As a general matter, under the objective theory of contracts to which Delaware adheres, it is presumed that the language of a contract governs when no ambiguity exists.  Under the objective theory, "'intent' does not invite a tour through [the plaintiff's] cranium, with [the plaintiff] as the guide."  This presumption that parties will be bound by the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length.  More specifically, Delaware courts have held that sophisticated parties may not reasonably rely upon representations that are inconsistent with a negotiated contract, when that contract contains a provision explicitly disclaiming reliance upon such outside representations.[121]

Delaware's enforcement of clear anti-reliance provisions reverberates through a long line of cases.[122]   "[A] party cannot promise, in a clear integration clause of a

---

defeat the clear words and purpose of the Final Agreement's integration clause, contracts would not be worth the paper on which they are written." (quoting *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988)); *Liberto v. Bensinger*, 1999 WL 1313662, at *14 (Del. Ch. Dec. 8, 1999) ("I believe that, just as the [plaintiff's] innocent misrepresentation claim has failed in part due to unjustifiable reliance, their mutual mistake argument is also flawed because it was they who assumed the risk of the mistake.").

[120] *See, e.g.*, *Progressive Int'l Corp.*, 2002 WL 1558382, at *7.

[121] *Id.* (alteration in original) (footnotes omitted) (quoting E. Allan Farnsworth, *Farnsworth on Contracts* § 3.6 (2d ed. 2000)).

[122] *See, e.g.*, *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35 (Del. Ch. 2015); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032 (Del. Ch. 2006); *Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129 (Del. Ch. 2003); *Progressive Int'l Corp.*, 2002 WL 1558382.

negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' . . . claim."[123]

"To be effective, a contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."[124]  Such provisions "identify the specific information on which a party has relied and which foreclose reliance on other information."[125]  "Delaware law does not require magic words."[126]

Section 6.6 of the Cross License is a standard integration clause that does not include clear anti-reliance language.  Section 6.6 provides:

> Entire Agreement.  This Agreement embodies the entire understanding of the Parties and their Granting Subsidiaries with respect to the subject matter hereof, and merges all prior oral or written communications between them.  Neither of the Parties or their Granting Subsidiaries shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein.  No oral explanation or oral information by either Party or any Granting Subsidiary shall alter the meaning or interpretation of this Agreement. . . .

---

[123] *Abry P'rs*, 891 A.2d at 1057.

[124] *Prairie Cap. III*, 132 A.3d at 51 (internal quotation marks omitted) (quoting *Kronenberg*, 872 A.2d at 593).

[125] *Id.* at 50 (citing *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 118–19 (Del. 2012)).

[126] *Id.* at 51.

The first sentence is a standard integration clause. The third sentence is a more specific integration clause, codifying the parol evidence rule and confining interpretation to the four corners of the Cross License. The second sentence comes closest to anti-reliance language, but falls short.

While "Delaware law does not require magic words,"[127] the relevant clauses of Section 6.6, taken together or standing alone, do not amount to clear anti-reliance language that forecloses Sanyo from seeking reformation. Section 6.6 does not include any clear or express statement that Sanyo has contractually promised that it did not rely upon statements outside the Cross License's four corners.[128] Nor does Section 6.6 identify the specific information on which Sanyo relied, which would foreclose Sanyo's reliance on other information.[129]

Instead, Section 6.6 reads as a "standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that [Sanyo] had agreed that it was not relying on facts outside the contract," and therefore does not suffice to bar reliance allegations that underlie a mistake theory.[130] Delaware Courts have concluded that similar clauses stating that the contract "contains the final and entire

---

[127] *Id.*

[128] *See id.*

[129] *See id.* at 50.

[130] *Kronenberg*, 872 A.2d at 593.

Agreement between the parties" and that "neither they nor their agents shall be bound by any terms, conditions, or representations not herein written" do not amount to clear anti-reliance language.[131]  By agreeing not to be bound "by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided" in the Cross License, Sanyo did not simultaneously promise that it would not rely on Intel's representations and understandings beyond the agreement's four corners.[132]  Section 6.6 does not, by itself, negate any argument that Sanyo justifiably relied on Intel's representations during negotiations about WCMs and multi-chip adapters, and therefore does not foreclose Sanyo's reformation claim.

## III.  CONCLUSION

Sanyo's Motion is **DENIED** with respect to Count I of the Amended Complaint and Count II of the Counterclaim.  Intel's Motion is **GRANTED** with

---

[131] *Two Farms, Inc. v. Davis, Bowen & Friedel, Inc.*, 2018 WL 2714796, at *4 (Del. Super. Ct. June 4, 2018) (noting such language does not indicate that the plaintiff "contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract" (quoting *Kronenberg*, 872 A.2d at 593)); *see also Alltrista Plastics, LLC v. Rockline Indus., Inc.*, 2013 WL 5210255, at *5–6 (Del. Super. Sept. 4, 2013) (denying motion to dismiss fraud claim based on anti-reliance clause in contract that stated: "The Agreement sets forth the entire understanding between the Parties with respect to the subject matter herein, and supersedes and replaces the terms of any and all prior discussions, agreements or understanding between the parties. There are no covenants, promises, agreements, warranties, representations, conditions or understandings, either oral or written, between the Parties with regard to the subject matter herein other than as set forth in the agreement.").

[132] Cross License § 6.6.

respect to Count I of the Amended Complaint and Count II of the Counterclaim, and is **DENIED** with respect to Count V of the Amended Complaint. The parties shall submit an implementing order within twenty days of this decision.